# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Jaycee Brown, on behalf of himself
and those similarly situated,

          Plaintiff,

                    Case No. 1:23-cv-1816-MLB

v.

MUY Pizza-Tejas, LLC, et al.,

          Defendants.

_____/

## <u>OPINION & ORDER</u>

Plaintiff Jaycee Brown filed this Fair Labor Standards Act ("FLSA") action against Defendants MUY Pizza-Tejas, LLC, MUY Pizza Southeast, LLC, James Bodenstedt, and certain unnamed corporations and individuals ("Defendants"). Defendants move to dismiss Plaintiff's complaint and compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1. (Dkt. 44.) Plaintiff moves to strike portions of Defendants' reply in support of their motion or to conduct discovery and file a sur-reply. (Dkt. 63.) For the reasons discussed below, the Court grants in part and denies in part without prejudice Defendants' motion

to compel arbitration, sets a hearing, and denies Plaintiff's motion to strike or conduct discovery and file a sur-reply.

## I.   Background

### A.   Plaintiff's Claims

Defendants operate or operated around 352 Pizza Hut locations across the United States. (Dkt. 1 ¶¶ 2, 11.) Plaintiff worked as a delivery driver at one or more of Defendants' locations in Georgia from 2017 through 2021. (*Id.* ¶¶ 83, 127.) Plaintiff sued, alleging "Defendants maintain a policy and practice of underpaying their delivery drivers in violation of the FLSA." (*Id.* ¶ 5.) Plaintiff claims Defendants did not adequately reimburse drivers for their delivery-related expenses (like vehicle and cell phone costs), thus failing to pay them the legally mandated minimum wage. (*Id.* ¶¶ 4, 91–93, 193.) Plaintiff also asserts an unjust enrichment claim under Federal Rule of Civil Procedure 23 on behalf of himself and current or former delivery drivers in Georgia, arguing Defendants were unjustly enriched by requiring their drivers to incur those expenses without proper reimbursement. (*Id.* ¶¶ 125–26, 171.)

Plaintiff moved for conditional certification of a collective action, which Defendants opposed.  (Dkt. 10.)  MUY Pizza-Tejas and Bodenstedt moved for partial dismissal for lack of personal jurisdiction.  (Dkts. 20, 35.)  The Court granted Plaintiff's motion for conditional certification and denied Defendants' motions to dismiss for lack of personal jurisdiction. (Dkts. 71, 104.)

### B.   Motion to Compel, Response, and Reply

Defendants now move to compel arbitration and dismiss this case. (Dkt. 44.)   At the time Defendants filed their motion, only three individuals had consented to join Plaintiff's action—Olivia Ramsey, Debralyn Duke, and William Stratmann (together with Plaintiff referred to as "Opt-Ins").[1]   Defendants say the Opt-Ins signed binding and enforceable agreements to arbitrate in connection with their employment.  (Dkt. 44-1 at 1.)  Defendants attach four "Agreement[s] to Arbitrate" ("Agreements"), each containing one of the Opt-In's electronic

---

[1] Because the Court granted conditional certification, many other drivers have "opted in" since Defendants filed their motion to compel arbitration. (*See, e.g.*, Dkts. 13, 32, 34, 64, 73–81, 85–95, 98.)  The newer opt-ins are not at issue, as Defendants have not filed an amended motion to compel related to those individuals.

signature with a date next to each individual's name. (Dkt. 44-2 at 8–16.)
Defendants also attach audit trails provided by a third-party servicer,
UKG, for the Agreement it claims each Opt-In signed electronically. (*Id.*
at 18–24; Dkt. 44-3 ¶ 3.)

Those audit trails purport to show the times and dates on which the
Opt-Ins signed the Agreements and other documents as part of the hiring
process. In each instance, the audit trail shows the user electronically
executed the Agreement within minutes of completing other forms
necessary for employment. Brown's electronic signature, for example,
appears on an Agreement dated October 6, 2017. (Dkt. 44-2 at 8.) The
audit trail for that document shows user "JBrown1400" signed the
Agreement on that date at 1:49 p.m. (*Id.* at 18.) Within the span of five
minutes, that user also electronically signed a direct deposit form, a new
employee summary form, an I-9 form, a notice of consent for drug testing,
a 1095-C distribution, a W-2 consent form, a pay acknowledgment FLSA
form, a cash handling policy, a drug and alcohol policy, a W-4 form, and
a G-4 form. (*Id.*)

Similarly, Ramsey's electronic signature appears on an Agreement
dated October 23, 2020. (*Id.* at 11.) The audit trail for that document

shows user "oramsey0226" signed the Agreement on that date at 3:38 p.m.   (*Id.* at 20.)   Within the span of 48 seconds, that user also electronically signed other forms like the ones noted above. (*Id.*) Duke's electronic signature appears on an Agreement dated February 19, 2018. (*Id.* at 13.)   The audit trail for that document shows user "DDuke0765" signed the Agreement on that date at 4:28 a.m.   (*Id.* at 22.)   That user also electronically signed other forms like the ones noted above within a span of 13 minutes.   (*Id.*)   Finally, Stratmann's electronic signature appears on an Agreement dated November 24, 2020. (*Id.* at 15–16.)   The audit trail for that document reflects user "WSTRATMANN844" signed the Agreement on that date at 2:24 p.m.   (*Id.* at 24.)   Within the span of two minutes, that user also electronically signed other forms like the ones noted above.   (*Id.*)

Defendants argue the Opt-Ins' FLSA and unjust enrichment claims fall within the scope of these Agreements because the Opt-Ins agreed to confidential binding arbitration to resolve any claims against the company and its former employees, including claims concerning wages or compensation.   (Dkts. 44-1 at 13–14; 44-2 at 8–16.)

Plaintiff says that, despite Defendants' evidence, none of the Opt-Ins executed arbitration agreements. (Dkt. 58 at 8–12.) Each Opt-In provided a declaration, denying having signed an arbitration agreement (or at least saying they don't remember doing so). (Dkts. 58-1; 58-2; 58-3; 58-4.) Brown, for example, says Defendants hired him to work in their Georgia stores in October 2017 and required him to complete certain training modules and paperwork prior to starting work. (Dkt. 58-1 ¶¶ 4, 5.) He claims that, on October 5, 2017, he filed out some "paperwork" on an "in-store computer" and then received a link via email to complete "tax and financial information paperwork." (*Id.* ¶¶ 7–9.) He says he completed this paperwork online via the link sent to him "over the next couple of days." (*Id.* ¶ 10.) He claims he "did not sign an arbitration agreement" on October 5, 2017 (when he was hired), October 6 (when Defendants claim he signed it electronically), or October 7 (when he began working). (*Id.* ¶¶ 12–14.) He says his manager, James Markle, knew his username and password for the store computer system and used

that access to complete Brown's training modules *after* his initial hiring and training.[2]  (*Id.* ¶ 15.)

Ramsey says she worked in Defendants' Georgia stores in two "separate stints: first from January 2019 to June 2019, and then from October 2020 until March 2021."  (Dkt. 58-3 ¶¶ 3, 4.)  She claims that, when she was hired as a delivery driver for Defendants, she received a link to fill out forms online before she began working.  (*Id.* ¶ 5.)  She says she filled out "I-9 and W-2 tax documents, and she acknowledged the company uniform policy, harassment policy, and various safety protocols."  (*Id.* ¶ 6.)  She claims she did not sign an arbitration agreement when she was hired or on October 23, 2020 (the date on which Defendants claim she signed it).  (*Id.* ¶¶ 7, 8.)  She says her manager, Dominic Redding, knew her username and password for the store

---

[2] As far as the Court can tell, the training modules are separate from the forms completed as part of the UKG onboarding process and are not included in the audit trails.  The parties do not argue otherwise.  So Brown's (or anyone else's) contention that a manager completed training modules provides no evidence that a manager completed the arbitration agreement or any of the necessary paperwork included in the audit trail.  These assertions merely provide evidence that the managers had access.

computer system and that managers completed training modules for her and others.  (*Id.* ¶¶ 9, 10.)

Duke says she worked in Defendants' Georgia stores in two "separate stints: first from approximately November 2017 until September 2021," when Defendants sold their franchises.[3]  (Dkt. 58-2 ¶ 3.)  She implicitly denies completing any paperwork online, challenging Defendants' assertion based on the UKG audit trail.  She claims that, when she was hired in November 2017, she was required to complete paperwork before beginning the job.  (*Id.* ¶ 5.)  She says she "completed all paperwork by hand in pen and ink on physical copies of documents." (*Id.* ¶ 6.)  She claims she does "not recall signing an arbitration agreement as part of this paperwork or at any point while working for" Defendants, so she "do[es] not believe" she signed an arbitration agreement.  (*Id.* ¶¶ 9, 10.)  She says she did not complete any training modules or other documents after her initial hiring.  (*Id.* ¶ 13.)  She claims her manager, Nick Conlon, knew her username and password for the store computer system.  (*Id.* ¶ 11.)  She does not, however, claim

---

[3] Duke's declaration does not specify when she started her second stint at Defendants' stores.  (Dkt. 58-1 ¶ 3.)

Conlon or anyone else used her log-in information to complete any paperwork or training modules for her or under her name.

Stratmann says Defendants hired him to work in their Texas stores in November 2020 and required him to complete certain training modules and paperwork prior to starting.  (Dkt. 58-4 ¶¶ 4, 5.)  Stratmann contends the "only thing [he] did on the computer was the required training modules and videos."  (*Id.* at ¶ 9.)  Like Duke, he claims he "completed all paperwork by hand in pen and ink on physical copies of documents."  (*Id.* ¶ 6.)  He says he "did not recall signing an arbitration agreement as a part of this paperwork," so he "do[es] not believe" he signed an arbitration agreement.  (*Id.* ¶¶ 7, 8.)  He says his manager, Jennifer Davis, knew his username and password for the store computer system and completed "some training videos and modules in [his] name after [his] initial hiring and training."  (*Id.* ¶¶ 10, 13.)

In an effort to dispel the Opt-Ins' claims that they did not electronically sign an arbitration agreement, Defendants attach a declaration from Britney Hernandez (the former Human Resources Manager for MUY Consulting, Inc.) to their reply brief.  (Dkt. 61-1.) Hernandez was "directly involved with the logistics, implementation, and

management" of MUY Pizza-Tejas's required electronic onboarding process through UKG. (Dkt. 61-1 ¶¶ 3, 4.) Hernandez provided additional information that she believes supports Defendants' contention that the Opt-Ins must have completed the electronic arbitration agreements. She explained that, when a manager hired someone, they logged into the UKG onboarding system and inputted the new hire's "basic demographic and job information" to generate that employee's "file." (*Id.* ¶ 5.) As part of that, the manager included the new hire's email address, causing the UKG system to send the new hire an email with a welcome letter. (*Id.* ¶¶ 6, 7.) The welcome letter contained a hyperlink to the UKG onboarding system, which prompted the new hire to create a password and choose a security question and answer. (*Id.* ¶¶ 9, 11.) The new hire input his or her I-9 information, citizenship information, physical address, emergency contact, equal employment opportunity information, veteran and disability status, W-4 information, state tax information, and direct deposit information. (*Id.* ¶ 12.) Once the new hire reviewed and approved that information, he or she clicked "finish" and "sign forms" buttons. (*Id.*)

The new hire then went to the "Electronic Signature Step," where the person had to re-enter his or her username, password, and social security number. (*Id.* ¶ 13.)  At this step, the new hire acknowledged an agreement to use electronic signature technology. (*Id.* ¶ 14.)  The new hire was then presented with documents to sign, which automatically generated an entry in the audit trail data that the corresponding form "has been generated." (*Id.* ¶ 15.)  The new hire had the opportunity to review the document and select the "click to sign" button. (*Id.* ¶ 18.)  Once clicked, the onboarding system generated an entry in the audit trail data that the document was "signed by employee." (*Id.*)  A new hire could not proceed to new documents until he or she signed the document presented on the screen. (*Id.*)  When the new hire completed signing documents, he or she clicked "submit all documents." (*Id.* ¶ 20.)

The hiring manager likewise had to use the UKG system to complete portions of the documents requiring the manager's signature. (*Id.* ¶ 21.)  The hiring manager was presented with documents, creating an entry that the document "has been generated." (*Id.* ¶ 22.)  Once the manager electronically signed the document, the onboarding system generated an entry in the audit trail data that the document "has been

signed by manager." (*Id.*)   The manager likewise clicked "submit all documents" once he or she reviewed and signed the necessary documents. (*Id.* ¶ 24.)

Hernandez says this onboarding process was "required for all of MUY's new hire employees." (*Id.* ¶ 28.)  And a new hire "could not begin work until [he or she] completed the onboarding process[,] including all documents that were included as part of" that process.  (*Id.*)  Hernandez says the Opt-Ins completed this process.  (*Id.* ¶ 25.)  She asserts that MUY Pizza-Tejas did not permit onboarding documents to be "completed in hard copy" or signed with "wet" signatures, and their human resources department did not accept paper copies of new hire paperwork.  (*Id.* ¶ 29.) She was not aware of any information suggesting a manager had completed or electronically signed the Opt-Ins' onboarding documents. (*Id.* ¶ 32.)  She says that if MUY Pizza-Tejas ever learned about a manager signing a document they should not have signed, "it was addressed with the District Manager and resubmitted with corrected signatures." (*Id.*)

## II.   Legal Standard

Section 2 of the FAA provides that a written agreement to settle controversies by arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."   9 U.S.C. § 2.   "This provision 'reflect[s] both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract.'"   *Inetianbor v. CashCall, Inc.*, 768 F.3d 1346, 1349 (11th Cir. 2014) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)).   Accordingly, courts apply a presumption in favor of arbitration, except in disputes concerning whether an agreement to arbitrate has been made. *Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016).

When a party moves a district court to compel arbitration under the FAA, the court's first responsibility is to determine whether "the making of the agreement for arbitration or the failure to comply therewith is . . . in issue."   9 U.S.C. § 4; *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1346 (11th Cir. 2017).   The Court applies a "summary judgment-like standard" to determine whether the parties agreed to arbitrate a dispute. *Burch*, 861 F.3d at 1346 (citing *Bazemore*, 827 F.3d at 1333).   A district

13

court must grant summary judgment to a moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608. The non-moving party must "go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a

motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).   Moreover, "'conclusory allegations without specific supporting facts have no probative value' for a party resisting summary judgment." *Bazemore*, 827 F.3d at 1333 (quoting *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000)).

## III.   Discussion

Procedurally, Plaintiffs says the Court should strike Hernandez's declaration as improper.  (Dkt. 63 at 6–8.)  Substantively, Plaintiff makes three arguments opposing arbitration.   First, Plaintiff says Defendants waived their right to enforce the arbitration agreements by failing to raise the issue until five months after their deadline to response to the complaint.  (Dkt. 58 at 12–19.)  Second, Plaintiff argues that Defendants still fail to meet their burden to prove that the Opt-Ins signed the Agreements and demands a jury, pursuant to 9 U.S.C. § 4, on the issue. (*Id.* at 8–12, 28.)  Third, Plaintiff argues that, even if the Opt-Ins signed the Agreements, the Agreements are unconscionable and unenforceable. (*Id.* at 19–27.)  The Court addresses each argument.

### A.      Motion to Strike or File Sur-reply

Plaintiff argues the Court should strike Hernandez's declaration because Defendants improperly raise new evidence in their reply brief. (Dkt. 63 at 6–8.)   Plaintiff alternatively asks the Court for leave to conduct discovery and file a sur-reply in the light of this "new evidence." (*Id.* at 8–10.)   It is generally true that "a court should not consider arguments raised for the first time in a reply brief." *Reliance Ins. Co. of Ill. v. Richfield Hosp. Servs., Inc.*, 92 F. Supp. 2d 1329, 1332 (N.D. Ga. 2000).   "That proposition does not, however, prevent a reply brief from addressing arguments first raised in the opposing brief.   That's what a good reply brief *should* do." *Thigpen v. Nissan Motor Co.*, 2023 WL 2760056, at *4 (N.D. Ga. Mar. 31, 2023) (emphasis in original).   "While '[n]ew evidence is not properly considered if offered for the first time in support of a reply brief, . . . evidence can be offered to rebut a point raised in an opposition brief.'" *Parker v. Alcon Mgmt. S.A.*, 2022 WL 3905872, at *3 (11th Cir. Aug. 31, 2022) (quoting *Thompson v. Alabama*, 428 F. Supp. 3d 1296, 1307 (M.D. Ala. 2019)) (emphasis added) (omission in original) (concluding district court did not err in relying on declaration attached to reply brief in finding no personal jurisdiction).

This is precisely what Defendants did here—they supplied Hernandez's declaration to rebut Plaintiff's assertions that the Opt-Ins did not sign the Agreements and that the signatures were not authentic. Defendants had a burden to show the Agreements existed. *Bazemore*, 827 F.3d at 1330.  They were not required to anticipate every potential attack on the Agreements, especially in the event Plaintiff did not challenge the authenticity of the electronic signatures on the Agreements and the audit trails.  The Court denies Plaintiff's request to strike or to conduct discovery and file a sur-reply and considers Hernandez's declaration in support of Defendants' motion to compel.

## B.   Waiver

Plaintiff says Defendants waived their right to enforce the arbitration agreements by raising the issue too late.  (Dkt. 58 at 12–19.) The Court disagrees.  Defendants asserted an arbitration right long ago. Indeed, in its opposition to Plaintiff's motion for conditional certification and motion to dismiss—filed about thirty days into this case—MUY Pizza-Tejas "notified" Plaintiff that it intended to "exercise its arbitration rights." (Dkts. 20-1, 21.)  It explained it was no longer an active company, had to obtain employment files from UKG, and would move to compel

arbitration once it obtained the necessary arbitration agreements. (Dkt. 20-1 at 9–10.)  In their motion to compel arbitration, Defendants provide a declaration from Dawson Bremer, an independent contractor for MUY Pizza-Tejas tasked with winding up the company's affairs. (Dkt. 44-2 ¶ 3.)  According to Bremer, MUY Pizza-Tejas used UKG's software "for new employee review and execution of all new employee documentation, including the arbitration agreements."  (*Id*. ¶ 8.)  UKG was uncooperative in turning over employment records, requiring Defendants to subpoena the documentation.  (*Id*. ¶¶ 13–15.)  Bremer finally obtained the Agreements on October 24, 2023.  (*Id*.)  Defendants promptly filed their motion six days after Plaintiff's counsel declined to voluntarily dismiss the case on November 3, 2023.  (Dkt. 44-3 ¶ 11.) Defendants have made it clear to Plaintiff that they intended to compel arbitration and have worked diligently to obtain the necessary documents.  They have not waived anything.

## C.   Failure to Sign the Agreements

The crux of the parties' dispute is whether, as a factual matter, the Opt-Ins ever signed the Agreements or whether someone else applied their electronic signatures.  "[A]rbitration is a matter of contract[,] and a

party cannot be required to submit to arbitration any dispute which he [or she] has not agreed so to submit." *AT&T Techs., Inc. v. Comm'ns Workers of Am.*, 475 U.S. 643, 648 (1986).  State contract law governs whether the parties entered into a valid arbitration agreement. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367–68 (11th Cir. 2005) (citing *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)); *Burch*, 861 F.3d at 1346 ("The threshold question of whether an arbitration agreement exists at all is simply a matter of contract."  (citations and quotation marks omitted)).

"Under Georgia law, a contract is enforceable if there is (a) a definite offer and (b) complete acceptance (c) for consideration." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008).[4]  The party seeking to compel arbitration carries the burden of demonstrating that a valid agreement to arbitrate exists. *Bazemore*, 827 F.3d at 1330.  But "[t]he party challenging enforcement of an arbitration agreement bears the burden of establishing a defense to the enforcement of the agreement."

---

[4] The Court notes that Stratmann worked for Defendants in Texas, but Plaintiff says there is "no functional difference" between Georgia's and Texas's contract laws.  (Dkt. 58 at 8 n.3.)  So the Court applies Georgia law.

*Parnell v. CashCall, Inc.*, 181 F.Supp.3d 1025, 1035 (N.D. Ga. Mar. 14, 2016).

Applying a summary judgment standard, Defendants have provided sufficient evidence to satisfy their initial burden to show that the parties entered into valid agreements to arbitrate, which the Opt-Ins signed. *Clark*, 929 F.2d at 608. Defendants submit the Agreements, which bear the basic requirements of offer, acceptance, and consideration, and show electronic signatures matching the Opt-Ins' names on certain dates. (Dkt. 44-2 at 8–16.) Defendants submit corresponding audit trails, showing the history of electronic activity related to the various onboarding documents each of the Opt-Ins allegedly signed as a part of their onboarding process. (*Id.* at 18–24.) Each audit trail reflects that the Opt-Ins electronically signed an "Agreement to Arbitrate" and other onboarding documents on the date matching the date on the Agreement itself—all within 48 seconds to 13 minutes. (*Id.* at 8–16, 18–24.)

Defendants submit Bremer's declaration, who says MUY Pizza-Tejas used UKG's onboarding software "for new employee review and execution of *all* new employee documentation, including the

arbitration agreements." (*Id.* ¶ 8 (emphasis added).)  Defendants also submit Hernandez's declaration to confirm the onboarding process was required for all new hires and no one could work until completing the process and executing all necessary documents.   (Dkt. 61-1 ¶ 28.) Hernandez likewise confirms that—pursuant to the audit trail—each of the Opt-Ins completed the onboarding process.  (*Id.* ¶ 25.)

According to Defendants' evidence, the onboarding process consisted of discrete steps that had to be completed in order.  (*Id.* ¶ 18.) Defendants sent an email to each of the Opt-Ins' personal email address, provided during the application process, to initiate the electronic onboarding process.  (*Id.* ¶¶ 6, 7.)  Then, a user with access to that email account used a hyperlink in the email to create a username and password.  (*Id.* ¶¶ 9, 11.)  That user accessed, reviewed, and signed each document in the onboarding process, supplying extensive personal information such as his or her social security number, citizenship, address, emergency contact name, and tax and direct deposit information.   (*Id.* ¶ 12.)   This evidence overwhelmingly supports the conclusion that the Opt-Ins electronically signed the Agreements.  So the

burden shifts to Plaintiff to show there is a genuine dispute of material fact that precludes summary judgment.  *Clark*, 929 F.2d at 608.

In denying they signed the agreements, the Opt-Ins fall into two categories: two who admit completing onboarding forms online but deny signing the Agreements and two who deny doing anything online, insist they completed physical paperwork only by hand, and say they do not recall signing any arbitration agreement.  The Court analyzes each category.

## 1. Jaycee Brown and Olivia Ramsey

Brown and Ramsey admit completing onboarding forms online but deny doing that for the arbitration agreements.  (Dkts. 58-1 ¶¶ 10, 12–14; 58-3 ¶¶ 5–8.)  They claim their managers knew their usernames and passwords, implying that the managers signed the Agreements.  (Dkts. 58-1 ¶ 15; 58-3 ¶ 9.)  Defendants say their self-serving declarations are insufficient to create a dispute of material fact as to the validity of the Agreements bearing their signatures.  (Dkt. 61 at 6.)  The Court agrees with Defendants.

The audit trails and other evidence show that Brown and Ramsey consented to the use of an electronic signature and later used that

signature to sign several documents, including a few under penalty of perjury: a W-4 form, W-2 form, electronic consent form, new employee summary information, I-9 form, hourly benefits acknowledgment form, withholding allowance certificate, employee handbook agreement, notice and consent for drug testing, drug and alcohol free workplace policy, cash handling policies, 1095-C distribution form, and direct deposit authorization.  (Dkt. 61-1 ¶¶ 46–74.)  Many of the documents include personal information that only Brown and Ramsey could have provided, such as their bank account information and social security numbers.  (*Id.*)  Brown and Ramsey suggest the managers might have completed their Agreements but fail to account for how their personal information appeared on other onboarding documents completed in the same 48 seconds (for Ramsey) or 5 minutes (for Brown).

This is especially true in the light of the fact that Brown and Ramsey neither challenge the accuracy of the audit trails nor deny electronically signing the other onboarding documents Defendants contend they signed.  (Dkt. 44-2 at 18–20.)  In fact, Brown admits he "completed tax and other financial information paperwork online via the link sent to [him]," and Ramsey admits that she was sent a link to fill out

forms online and filled out "I-9 and W-2 tax documents." (Dkts. 58-1 ¶ 10; 58-3 ¶¶ 5, 6.)   Again, the audit trail shows the Agreements were completed online within seconds or minutes of the documents Brown and Ramsey admit completing online.   The combination of the audit trail and Brown's and Ramsey's admissions provide powerful evidence these two Opt-In Plaintiffs signed the Agreements electronically.   *See Crews v. Maxim Healthcare Servs., Inc.*, 2021 WL 2417732, at *3 (W.D. Tenn. June 14, 2021) ("Further belying Plaintiff's assertion that his electronic signature on the arbitration agreement is invalid, is his conspicuous acceptance of the legal effect of his electronic signatures on every other piece of employment paperwork.").

True, their sworn denials count as something, but only a "scintilla" of evidence under the circumstances.   Given the applicable summary judgment standard, a mere scintilla is not enough to allow the non-movant to prevail.   *Anderson*, 477 U.S. at 252.   The Court grants

Defendants' motion to compel arbitration for Brown and Ramsey on an individual basis pursuant to their respective Agreements.[5]

## 2. Debralyn Duke and William Stratmann

Duke and Stratmann are in the other bucket. They say they completed all paperwork by hand in pen and ink on physical copies of documents and do not recall or believe they signed an arbitration agreement. (Dkts. 58-2 ¶¶ 6–10; 58-4 ¶¶ 6–8.) They implicitly deny doing anything online. So the audit trails (and the execution of the Agreements at the same time as the creation of other documents) do not have the same forceful impact for them as they had for Brown and Ramsey. They also claim their managers knew their usernames and passwords, likewise implying that the managers may have signed the Agreements. (Dkts. 58-2 ¶ 11; 58-4 ¶ 10.) Again, this allegation has more impact here than for Brown and Ramsey, as Duke and Stratmann deny doing anything electronic and present their managers (or someone else) as having done it. Defendants say their self-serving declarations

---

[5] Plaintiff does not contest Defendants' argument that the FLSA and unjust enrichment claims fall within the scope of the Agreements. (*See* Dkt. 58.)

are insufficient to create a dispute of material fact as to the validity of the Agreements bearing their signatures.  (Dkt. 61 at 6.)  Defendants add that there is no evidence a manager could have or did log onto their profiles to complete their Agreements, as they would have had to have access to highly personal information, including tax, bank, and identification information.  (*Id.* at 3 n.2.)  But Duke and Stratmann don't deny providing that information (at least not explicitly); they simply say they did everything on paper documents and that their managers knew their log-in information.   The Court concludes that Duke's and Stratmann's assertions create a genuine issue of material fact as to the validity of the Agreements bearing their signatures.

Hernandez states MUY Pizza-Tejas did not permit onboarding documents to be "completed in hard copy" or signed with "wet" signatures and that their human resources department did not accept paper copies of new hire paperwork.  (Dkt. 61-1 ¶ 29.)  Nor was she aware of any communications or documentation reflecting that a manager had completed or electronically signed the Opt-Ins' onboarding documents. (*Id.* ¶ 32.)   That MUY Pizza-Tejas did not permit or accept physical paperwork or that Hernandez was unaware of any instances in which a

manager completed the electronic onboarding process does not mean that this nevertheless occurred. Duke's and Stratmann's unequivocal assertions that they only completed paperwork by hand place the existence of the electronic Agreements at issue.

The Court believes limited discovery may be helpful in resolving this dispute. The Court thus denies Defendants' motion to compel arbitration for Duke and Stratmann without prejudice and sets a hearing to discuss whether additional discovery might permit the Court to decide this issue or (alternatively) to schedule discovery and trial for a jury to determine whether Duke and Stratmann executed the agreements.

### D.    Unconscionability/ Unenforceability

Plaintiff says, even assuming the Opt-Ins signed the Agreements, the Agreements are unconscionable because they were distributed under the shadow of litigation that the delivery drivers did not know about. (Dkt. 58 at 19–24.) Plaintiff explains that, in May 2016, a delivery driver sued a Muy brands operating company for FLSA violations. (*Id.* at 20); *see Finstad v. Muy Minn., LLC*, 16-cv-1172 (D. Minn. May 4, 2016), ECF No. 1. Plaintiff notes that the parties reached a settlement agreement that the district court approved on May 5, 2017. (Dkt. 58 at 20.)

Defendants respond that they were not required to disclose past litigation to future employees, as the Agreements at issue were not signed until after the conclusion of *Finstad*. (Dkt. 61 at 12.) The Court agrees with Defendants. The cases Plaintiff relies on involved arbitration agreements distributed *during* the class or collective actions. *See In re Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 251 (S.D.N.Y. 2005) (defendant did not inform class members that they were "forfeiting their rights as potential plaintiffs" in the pending class action); *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 917–19 (11th Cir. 2014) (defendant implemented a retroactive arbitration policy after an FLSA lawsuit was filed and at the same time the court scheduled the collective action certification process).[6] Here, the Opt-Ins signed the Agreements after *Finstad* settled. Plaintiff says the same principles of fairness should apply but cites nothing to support his assertion. (Dkt. 58 at 23.) Plaintiff

---

[6] The Court recognizes *Billingsley* is not binding. The Court cites it as instructive nonetheless. *Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

has presented no evidence from which the Court can find that the Agreements were unconscionable.

Plaintiff also says the Agreements are unenforceable because FLSA collective actions may not be subject to arbitration. (Dkt. 58 at 24–27.) Plaintiff argues that a district court or the Department of Labor must approve the resolution, so any settlement reached in arbitration is unenforceable. (*Id.* at 25.) The Supreme Court has made clear that arbitration is consistent with the FLSA. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018) (noting that "[e]very circuit to consider the question has held that the FLSA allows agreements for individualized arbitration."). Plaintiff appears to conflate private settlement of claims and a bargained-for arbitration process. Settlement and arbitration, however, are two distinct processes. The Eleventh Circuit both requires judicial approval of FLSA settlements and allows arbitration of FLSA claims. *Compare Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982) (requiring judicial approval of an FLSA settlement), *with Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1335 (11th Cir. 2014) (enforcing collective action waiver in

arbitration agreement).  Plaintiff has presented no evidence to show that the Agreements are unenforceable.

## IV.   Conclusion

The Court **GRANTS** in part and **DENIES** without prejudice in part Defendants' Motion to Dismiss and to Compel Arbitration (Dkt. 44).  The Court **SETS** a hearing for August 28, 2024, at 10:00 a.m., in Courtroom 1906.  The purpose of the hearing will be to discuss whether limited discovery could provide the Court more evidence with which to decide the issue or (alternatively) to set a discovery and trial schedule on the sole issue of whether Opt-In Plaintiffs Duke and Stratmann executed the Agreements.  The Court **DENIES** Plaintiff's Motion to Strike or for Leave to Conduct Discovery and File Sur-reply (Dkt. 63).

**SO ORDERED** this 18th day of July, 2024.


_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE